## THE WELLINGTON.

### BLACKBURN *v.* THE WELLINGTON.

*(District Court, N. D. California. November 30, 1891.)*

SALVAGE—COMPENSATION—CONTRACT FOR TOWAGE.

The steamer W., bound to San Francisco with a cargo of 2,350 tons of coal, lost her propeller blades, became helpless, and drifted near the mouth of the Columbia river. While in communication with a vessel which offered to tow her to an anchorage, from which tugs were easily accessible, and while in no immediate danger, she hailed the steamer M., which was bound for San Francisco, and asked towage to that port. The M. was only about half her size, was not fitted for towing, and was also laden with coal. Her master, however, offered to leave the compensation to the decision of the W.'s owners, after arrival in San Francisco, which offer was rejected, and after much haggling $15,000 was agreed upon. Neither vessel possessed a suitable tow-line, and five small lines were used. This, in case of bad weather, would have been a source of danger, but the weather proved good, and the vessels arrived in about five days. *Held* that, while the compensation was excessive, yet, in view of the fact that there was no compulsion, it was not so exorbitant as to justify the court in setting the contract aside.

In Admiralty. Libel by D. O. Blackburn against the steam-ship Wellington, her freight and cargo, upon a contract for towage. Decree for libelant.

*Geo. W. Towle, Jr.*, for libelant.
*Page & Eells*, for claimant.

Ross, J. This is an action upon a contract for services rendered the steamer Wellington by the master of the steamer Montserrat. Both vessels were at the time engaged in transporting coal from Departure Bay, in British Columbia, to the port of San Francisco. On the 24th of April last the Wellington sailed from that bay for San Francisco with a cargo of 2,350 tons of coal, and in the morning of the second day after sailing, without any apparent cause, lost all the blades of her propeller. She had not sufficient sail-power to give her master any control over her course, and she was therefore subject to be carried anywhere the currents and winds might take her. At the time of the accident the Wellington was about 72 miles in a south-westerly direction from the mouth of the Columbia river. The next day she encountered a severe gale, lasting about 24 hours, during which she lay in the trough of the sea, with the seas breaking heavily over her fore and aft. After the storm she continued to drift as carried by the currents, the wind being shifting, the weather unsettled, and the sea a strong north-west swell, until about 7 or 8 o'clock in the evening of the 29th of April she was within 10 or 12 miles of the mouth of the Columbia river, the sea then being comparatively smooth, and the weather moderate. The Columbia river has, at its mouth, a bad bar, which cannot be passed in very bad weather, and is not ordinarily crossed during the night. To the north and south of it, for a number of miles, there is anchorage near the beach, which is fairly good in moderate weather, but which is not safe in case of storms, which might, with reasonable probability, be anticipated at that season of the year. The current at the mouth of the river sets quite strongly to the northward and inshore. There is a light-house there, at which a lookout is kept. The light-house has means of communicating with tug-boats in the Columbia river which ordinarily, at night, lay at Astoria, about 15 miles up the river. There were at the time tug-boats in the river with sufficient power to have towed the Wellington into the Columbia river, or to have towed her to San Francisco. The Wellington, at the time of the making of the contract sued on, was within sight of the light-house. While in the position described, the steamer Sussex, bound out from the Columbia river, seeing the Wellington with a signal of distress flying, approached her, sent an officer on board, and offered to tow her to an anchorage near the bar, which she reported as breaking badly, for a salvage compensation. While the officer was on board, the Montserrat came in sight, approached the Wellington, was hailed by her master, who requested the master of the Montserrat to come on board, which he did. The master of the Wellington then asked the master of the Montserrat whether he thought he could tow the Wellington to San Francisco, and the latter replied that he thought he could. The master of the Wellington then dismissed the officer from the Sussex, asking him to report his thanks to his master, but that he did not want the proffered services. That being done, negotiations were opened with the master of the Mont-

serrat as to the terms upon which he would agree to tow the Wellington, with all on board, to San Francisco. The master of the Montserrat offered to perform the service and leave the amount of compensation to be fixed by the owners of the Wellington, but the master of the Wellington declined that proposition, and wanted a sum fixed upon. The master of the Montserrat then said he would perform the service for $25,000. The master of the Wellington said, "No;" he would not listen to that, but offered $5,000, and then $10,000. The master of the Montserrat then said he would perform the services for $20,000, and the master of the Wellington offered $12,500. Fifteen thousand dollars was finally agreed upon between the parties for the service, and the master of the Montserrat undertook it. The mouth of the Columbia river is about 554 miles from San Francisco. The Montserrat is a merchant vessel, not fitted in any respect for towage purposes. The first hawser with which the attempt to tow was made was furnished by the Wellington. It was a large one, but when strain was put upon it, it immediately parted, was found worthless, and was cut adrift. Within an hour or two five small lines, part furnished by one vessel and part by the other, were got out, and made fast on board the Wellington, part to her anchor cable and part to her foremast; and, on the Montserrat, to her mooring bits, fore, aft, and amid-ships, that being the only available means of making the lines fast on that ship. In proceeding to San Francisco good weather was encountered so far as wind and sea were concerned, with about 24 hours of heavy fog, but the evidence shows that storms might have reasonably been anticipated at that season. The ships arrived safely in San Francisco in a little more than four days from the time the Montserrat entered upon the performance of the service, but the time consumed in towing was a little less than four days. Both ships were loaded, the Wellington's cargo being about double that of the Montserrat.

No one doubts that when the circumstances of a case render such action proper a court of admiralty will refuse to enforce a contract made for salvage services. But is this one of those cases? I cannot see any just ground for holding that the master of the Wellington, in making the contract in question, acted under compulsion or duress, or that any advantage was taken of his unfortunate position by the master of the Montserrat. Nothing could have been fairer than the offer of the master of the Montserrat to perform the service, and let the compensation therefor be fixed on arrival in San Francisco by the owners of the Wellington. Yet that offer was refused by the master of the Wellington, who, for some reason not apparent, wanted the amount to be fixed in advance. There was no compulsion about the case, first, for the reason that the salvor, as just stated, offered to render the service without any contract at all, which offer was refused by the master of the Wellington. This fact is of itself sufficient to dispose of that objection to the contract made. But it may be added that the Sussex was present, and her officer was, when the negotiation with the master of the Montserrat begun, contending that he, as representative of the Sussex, was entitled to be employed by the master of the Wellington. It is true, the Sussex did not propose

to tow the Wellington to San Francisco, the port of her destination, but only to an anchorage near the mouth of the Columbia river, where she would have been safe so long as good weather continued, and from which she could have been rescued by any passing steamer, or by a tug from the Columbia river. The tugs plying in that river could easily have been summoned by means of the light-house. The Wellington was therefore not only not in immediate danger, but other relief was available at the time her master entered into the contract in question. He was in a position to choose, and he chose not only to contract with the master of the Montserrat for the towing of his ship and cargo to her port of destination, but to fix in advance upon the amount to be paid for the service. That amount was undoubtedly too large for the service, but I do not think it so exorbitant as to justify the court in setting aside the contract thus made. There were many elements of danger in the service. In the first place, it was undertaken at a time of the year when, according to the evidence, it was reasonable to anticipate storms along that coast. The evidence further shows that the machinery of ordinary merchant vessels, such as the Montserrat, is about 25 per cent. less than that of vessels specially fitted for towage purposes; and that a vessel not so fitted, in undertaking to tow a heavily laden ship, like the Wellington, takes a very substantial risk of injury to her own machinery. In the event of such injury, the Montserrat herself might have become the subject of a salvage service, and, perhaps, a total loss. Besides, the ordinary danger attending the towing of a large and heavily laden ship in the open ocean by another ship was, in this instance, greatly increased by the fact that, instead of one large line, five small ones had to be employed in towing, and by the further fact that the tonnage of the Wellington was nearly double that of the Montserrat. Moreover, the master of the Montserrat was assuming responsibility for any damage the owner of his cargo might sustain by reason of delay in delivering it, caused by the service undertaken by him, the duration of which could only be surmised, and which was liable to be greatly extended by matters beyond his control. He also assumed responsibility to the owners of the Wellington for any injury that steamer might suffer by reason of the negligence of himself, his officers, and crew in carrying out the contract, the performance of which on his part was essential to entitle him to any compensation. In view of all of the facts and circumstances of the case, I am of the opinion that the contract entered into by the parties should be enforced by the court, and a decree in accordance therewith will be entered.